**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **KIMBERLY HOUSTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 22-cv-02395-MSN-tmp** |
| ) | |
| **MEMPHIS LIGHT, GAS, AND** ) | |
| **WATER DIVISION,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER DENYING MOTION FOR SANCTIONS**

Before the court is plaintiff Kimberly Houston's Motion for Sanctions Against Defendant Memphis Light Gas and Water Division ("MLGW") for Failure to Comply with the Order Directing Parties to Take Depositions and Fed. R. Civ. P. 30(b)(6). (ECF No. 118) The motion was referred to the undersigned on May 21, 2024. (ECF No. 121.) For the reasons below, the motion for sanctions is DENIED.

**I.   BACKGROUND**

On March 18, 2024, the undersigned entered an Order Directing Parties to Take Depositions. (ECF No. 116.) In that order, the undersigned directed the parties to conduct, among others, the deposition of Rule 30(b)(6) designee Bettye Hartwell on April 5, 2024. (Id., p. 1.) The deposition took place on that date as directed by the court. In her Amended Notice of 30(b)(6) Deposition, Houston provided a list of twenty-one topics that would

be covered. (ECF No. 118-1.) At issue in this motion are the following topics:

> 1. The identities of any individuals who played a decision-making and/or consultative role in the decisions to take action or not take action regarding any of the facts and circumstances alleged in the First Amended Complaint.
>
> . . .
>
> 3. Any non-privileged discussions amongst MLGW management level employees and/or executives after Ms. Houston was terminated from her Assistant Business Manager position regarding whether she was going to be allowed to return to her previous MLGW position — Customer Accounts Processor.
>
> . . .
>
> 14. The identities of any individuals who played a decision-making and/or consultative role in the decision to enact MLGW's Testing Policy Statements policy.
>
> 15. The discussions that were had between the individuals identified in Topic No. 14 regarding MLGW's Testing Policy Statements policy prior to its enactment or the date in which it began being enforced.
>
> . . .
>
> 18. Any former Business Manager and Assistant Business Manager who, upon the termination of his/her IBEW Local 1288 appointment, was required to take a pre-employment test pursuant to MLGW's Testing Policy Statements policy, including, but not limited to, his/her (1) name, (2) year that his/her appointment with IBEW Local 1288 ended, (3) MLGW seniority, (4) present or most recently held position, (5) year of resignation and/or retirement — if applicable, (6) former positions with MLGW, and (7) the name and purpose of the test he/she was required to take.

(Id. at PageID 995-97.)

- 2 -

The parties have each submitted excerpts from Hartwell's deposition transcript as exhibits. See (ECF No. 118-2; ECF No. 122-1 (collectively "Hartwell Dep.").) Regarding topic number one, the deposition testimony was as follows:

> Q.   Let's go down the list. The first topic, do you know of any individual who played a decision making and/or a consultative role in the decision to take action or not take action regarding any facts and circumstances alleged in the first amended complaint. Will you please identify those individuals?
>
> MR. HENDERSON [Defendant's counsel]: Object to the form.
>
> A. Can you clarify the facts of the first amended complaint?
>
> BY MR. SPENCE [Plaintiff's counsel]:
>
> Q.   Ask a better question. Any — the identity of any individuals — strike that. Did you review the first amended complaint prior to today's deposition?
>
> [A]. I reviewed a lot of documents. I can't memorize them all by hand, so you'd have to — not that I'm saying I didn't. I just would have to see that first amended complaint to tell you if I reviewed it.
>
> Q.   But you can't say for sure whether or not you looked at the first amended complaint?
>
> A.   But I'm asking. The question was the facts and circumstances alleged in the first amended complaint.
>
> Q.   And I understand — I understand what you're saying. My question is, you can't say for sure whether or not you looked at the first amended complaint. You may have, you may not have?
>
> A.   Correct.
>
> Q.   Okay. Let's go to Topic Number 2. Excuse me, Topic Number 3 . . . .

(Hartwell Dep. 19:12-20:21.)

After completing the examination of topic number one, plaintiff's counsel proceeded to topic number three, which related to non-privileged discussions regarding whether Houston would return to her previous role as Customer Accounts Processor:

Q. What non-privileged discussions took place regarding whether Ms. Houston was going to be allowed to return to her previous MLGW position of customer accounts processor?

A. MLGW ESTA, Employee Services TA management collaborated with MLGW compensation group in reference to the process to make sure it's consistent with our previous processes with other employees in a similar situation, and then, it would be HPPD, which would be Angela. At that time, it wasn't Angela Hewlett. It was - I don't know who the manager was, but those departments would collaborate in order to have those discussions.

Q. And I think you said those departments would collaborate. I'm asking, did those departments collaborate?

A. Yes. Based on the e-mails and information that I read.

Q. And the first thing you said was MLGW ESTA; did I say that correctly?

A. That's employee — that's Eric Conway, employee services talent acquisition.

Q. So, Eric Conway and his group —

A. Manager.

Q. — collaborated with MLGW compensation group?

A. Yes.

Q. And do you know who worked at MLGW compensation group at that time?

- 4 -

A.   Valerie Whitlow, and then, the LEDI was Jay — Jay
Mosby.

Q.   So Eric Conway collaborated with Valerie Whitlow
and Ms. Meachem to discuss whether or not Ms. Houston
was going to be allowed to return to her prior position?

A.   Yes.

Q.   Okay. And you gleaned this from reviewing email
communication?

A.   Yes.

Q.   Email communication in which Jay Mosby-Meachem was
copied on, or?

A.   One e-mail, she was copied on in reference to what
position she was talking to Valerie Whitlow.

Q.   What did Jay Mosby-Meachem say in that?

. . .

A.   I would have to see the e-mail to tell you the exact
words that was a part of the documents.

. . .

Q.   But you didn't bring it with you?

A.   No.

Q.   Okay. Do you remember what Valerie Whitlow said in
these electronic discussions that . . . that you
reviewed?

. . .

A.   I would have to see the email to clarify. It was
part of the documents that I received that was given to
— that we shared with them.

. . .

- 5 -

Q.   And do you remember what Eric Conway said in any of these discussions, electronic or otherwise, that you reviewed?

. . .

A.   If I had a copy of that e-mail, I could tell you exactly what was said. I can't.

. . .

Q.   But as you sit here today, under oath, you can't — you can't tell me what was said?

. . .

A.   Specifically what was said, I'd have to have a copy of the email, but it was based on the letter that was sent by the IBEW in reference to Kim Houston no longer being assistant business manager and starting the process based on the memorandum of understanding Article 14 to start that process.

. . .

Q.   But what you can tell me is that Mr. Conway, Ms. Whitlow and Ms. Meachem had a discussion, but as you sit — well, let me ask the question in parts. First question: You can testify that Eric Conway, Valerie Whitlow and Jay Mosby had discussions, whether electronic or otherwise?

A.   Yes.

Q.   But as you sit here today, you cannot tell me what they discussed in those conversations, because you don't have the emails in front of you?

A.   I cannot tell you the exact words that was stated, but I can — because I don't have the e-mail in front of me, but it was based on the letter that was sent by IBEW to start the process in returning Kim Houston to her previous role, which was the customer accounts.

Q.   So, let's see if we can go a little bit further. So, they had a discussion, based on the letter. Do you even remember sort of what they discussed at all?

- 6 -

. . .

A.   Well, the facts in the letter is that Kim Houston is being removed from the assistant business manager role, which was sent by the IBEW president at that time.

. . .

A.   And that was based off the letter.

Q.   Okay. And as you sit here today, you don't — you didn't bring a copy of that letter with you?

A.   The IBEW letter?

Q.   Whatever letter you're referring to.

A.   No, I did not bring the letter with me.

Q.   Do you know who drafted the letter that you're talking about?

A.   IBEW president at that time.

Q.   And would that be William Rick Thompson?

A.   Rick Thompson, yes.

Q.   And are you talking about the letter in which he terminated Ms. Houston?

A.   The letter that he terminated her from, the assistant business manager role, yes.

Q.   And in these electronic discussions that you reviewed, did either Mr. Conway, Ms. Whitlow or Ms. Meachem say, "Hey do we need to get Kim back to her prior position?"

. . .

A.   I cannot tell you exactly what was said in the email, but the email was part of the documents I reviewed that was given, that was shared with you. It was just documents that I reviewed.

. . .

A.   With me. I'm sorry, with me.

. . .

Q.   Okay. But where are these documents now? Are they on your desk?

A.   They may be back in my office now, yeah.

Q.   You may have reviewed them, you don't know?

. . .

[A.] Yeah, but I did — the documents were shared with the cases of documents I read.

. . .

Q.   But you don't recall any. And I think we can move on, but you don't recall any statement either with Mr. Conway, Ms. Meachem or Ms. Whitlow asserted in any of these electronic discussions to talk about it today with me?

. . .

A.   I cannot tell you specifically what the email stated, unless I had a copy of the e-mail.

. . .

Q.   I guess this is a conundrum that I'm in and maybe you can help me out. If all you can say is that I know Mr. Conway, Ms. Whitlow and Ms. Meachem had a discussion, but I don't have the e-mail in front of me, so I can't — so I can't testify about things that I don't have sitting in front of me. I can just kind of move on, but if you have some recollection about these communications, I want to be able to ask you about it. You kind of see my conundrum?

. . .

Q.   My question is, do you have any recollection about anything that was discuss in these electronic communications that I can ask you about?

. . .

A.   I think I answered it and it was more of after receiving the letter from Rick Thompson. I move forward with Article 14 in order to return Kim Houston to her previous role.

. . .

Q.   And who asked that question?

A.   I cannot specifically say which email asked the question.

Q.   Do you recall the response?

A.   In reference to what?

Q.   The question that you just talked about?

A.   No.

Q.   Okay. Do you recall who responded?

A.   It was lots of e-mails. I know Valerie Whitlow responded to one e-mail. I can't tell you exactly what she said. And Jay asked a question about the role, but that's all I can tell you.

Q.   Okay. And that's all you can tell me. If it is, we can just move on to the next topic.

(Id. at 21:9-31:3.) Regarding these emails, Houston claims that "none of these emails have been produced during the discovery phase of this case, . . ." (ECF No. 118 at PageID 985.) However, prior to the deposition, MLGW produced the referenced correspondence on May 24, 2023, as evidenced by its Responses to Plaintiff's First Set of Requests for Production of Documents. (ECF No. 122-3 at PageID 1103, 1115-36.) Tellingly, Houston in her reply brief does

not dispute that she received this production prior to the deposition.

Later in the deposition, plaintiff's counsel examined Hartwell based on topic numbers fourteen and fifteen, which dealt with (A) "[t]identities of any individuals who played a decision-making and/or consultative role in the decision to enact MLGW's Testing Policy Statements policy" and (B) "[t]he discussions that were had between the individuals . . . regarding MLGW's Testing Policy Statements policy prior to its enactment or the date in which it began being enforced." (ECF No. 118-1 at PageID 997.) Prior to being asked specific questions on topic numbers fourteen and fifteen, Hartwell explained her understanding of the MLGW testing policies and with whom she spoke in obtaining information necessary to respond to questions in this deposition:

> Q.   When was MLGW testing policies, statements, policy document enacted?
>
> . . .
>
> A.   Based on my conversation with HPPD, the very first date on the document, I believe, was 12/04. That's when it was incorporated, the very first date.
>
> . . .
>
> Q.   But you recall — did you review the document prior to today's deposition?
>
> A.   No — yes, yes, I did. It was part of my packet, yes.
>
> Q.   And since you reviewed it, you do know that a signature is not on the document?

. . .

A.   No.

. . .

Q.   And you said you had a conversation with somebody in HPPD?

A.   Yes.

Q.   Who did you speak with in HPPD?

A.   Angela Hewlett, manager of HPPD, training university.

Q.   And you said that she told you that it was enacted in 12/1/2004?

A.   The very first date that's on the document, yes.

. . .

Q.   . . . Do you know who wrote this document?

A.   It's a HPPD document.

Q.   And that would be Angela Hewlett's department?

A.   Area now, yes.

(Hartwell Dep. 47:18–48:23, 52:4–52:9.) After Hartwell gave this testimony, plaintiff's counsel proceeded to ask questions on topic numbers fourteen and fifteen:

Q.   Let's turn to Paragraph Number 14, excuse me, Topic Number 14. And it reads, the identity of any individual who played a decision making or a consultative role in the decision to enact MLGW's testing policy, statements policy. Who are those individuals?

A.   HPPD, human performance people management.

- 11 -

Q.   And as you sit here, can you identify that person
for me or those people for me?

A.   I don't know if Angela Hewlett was in that role at
that time. I would have to — she's the HPPD manager,
currently.

Q.   But as you sit here today, you don't know who it
was?

A.   Yes.

(Hartwell Dep. 60:21–61:12.)

Finally, plaintiff's counsel examined Hartwell on topic
number eighteen, which sought information about whether any former
Business Manager or Assistant Business Manager was required to
take a pre-employment test pursuant to MLGW's Testing Policy
Statements policy upon termination of their IBEW Local 1288
appointment:

Q.   Let me first ask you some basic questions. Are there
any other, besides Ms. Houston, business managers or
assistant business managers who upon the termination of
working at IBEW local were required to take a test?

A.   Patrick Epps.

Q.   Is he the only — the only individual?

A.   Yes.

Q.   Was he required to take a test pursuant to — this
is a good question — pursuant to MLGW's testing policy,
statements policy?

A.   He was required to take a test in order to return
to his previous, yes, previous role.

Q.   Do you have the testing policy statements in front
of you?

A.   Yes.

Q.   And it's your testimony that Patrick Epps was required to take a test pursuant to the document, the testing statements policy in front of you right now?

A.   He had to take the required test to return to his previous role after leaving his assistant business manager.

Q.   Based on the document you have in front of you right now?

A.   Whatever required testing is.

Q.   Okay. So, yes. All right. Is Patrick Epps still a MLGW employee?

A.   No, he retired.

Q.   What year did he retire?

A.   I don't know the exact year.

Q.   Okay. Do you know the name of the test he was required to take?

A.   I didn't memorize it, but it is a test that he took and he passed the first one. And then, in between that time, he did retire. He didn't take the second test. He retired.

Q.   Do you know the name of the position that he went back to?

A.   Systems, yes — no. I do not know, exactly.

Q.   So, if you don't know the name of the test and you don't know the position, how can you tell me that the testing policy statement was the document that governed whether or not he was required to take a test?

A.   Because the documents I received, that document, testing documents were in those documents.

Q.   But —

- 13 -

A.   It's the same documents that were shared before.

Q.   Do you know the year that he resigned or he retired or that he was terminated from MLGW?

A.   It's in those documents, and he retired.

Q.   Okay. Do you know the year that Mr. Epps was appointed — excuse me. Do you know the year that Mr. Epps' appointment to IBEW Local 1288 ended?

A.   The exact year, no.

Q.   Do you know Mr. Epps' MLGW seniority at the time of his retirement?

A.   Not exact seniority, no.

Q.   Okay.

A.   But it was in the documents that we shared.

Q.   Almost finished. Let's go to Topic Number 19.

(Id. at 75:21–78:22.)

## II.  ANALYSIS

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides that "a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity . . . ." Fed. R. Civ. P. 30(b)(6). "The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf . . . . The persons designated must testify about information known or reasonably available to the organization." Id. "The designated witness must be prepared by the organization to adequately testify on the noticed topics." MD Auto Grp., LLC v.

<u>Nissan N. Am., Inc.</u>, No. 1:21-CV-01584-CEF, 2023 WL 3251218, at *4 (N.D. Ohio May 4, 2023) (quoting <u>Champion Foodservice, LLC v. Vista Food Exch., Inc.</u>, No. 1:13-cv-1195, 2016 WL 4468000, at *13 (N.D. Ohio Aug. 23, 2016)). "'Preparation of a Rule 30(b)(6) witness is an active process,' as the witness must 'review all matters known or reasonably available to the corporation in preparation for the deposition, even if the documents are voluminous and burdensome to review.'" <u>Id.</u> (quoting <u>Champion Foodservice, LLC</u>, 2016 WL 4468000, at *13).

Based on the deposition transcript provided to the court, the undersigned concludes that Hartwell was not an unprepared Rule 30(b)(6) representative. Regarding topic number one, Houston argues that "Hartwell could not provide information that was known or available to MLGW . . . because, by her own admission, she may or may not have reviewed the First Amended Complaint in preparing for the deposition." (ECF No. 118 at PageID 981.) However, in the deposition, Hartwell explained that she reviewed a large packet of documents that would allow her to answer questions related to the facts and circumstances alleged in the First Amended Complaint. Simply because she testified that she "would have to see that first amended complaint to tell you if I reviewed it" does not on its own demonstrate that Hartwell was unprepared to answer questions relevant to the noticed topic.

- 15 -

Regarding topic number three, Houston argues that Hartwell was unprepared because, "[a]lthough Ms. Hartwell was able to provide testimony that a non-privileged discussion had occurred among several employees, she was unable to provide any substantial details regarding the content of the discussion or what the individuals involved in the discussion said." (Id. at PageID 985.) Specifically, Houston argues that, even though Hartwell claimed to have reviewed and been provided the emails by MLGW's counsel, she "did not bring them to the deposition and could not recall their content with any specificity." (Id.) Further, Houston claims that none of the emails were produced in discovery, so counsel was unable to produce the emails to Hartwell during the deposition. (Id.) However, the deposition excerpts demonstrate that Hartwell reviewed the emails in preparation for the deposition, identified the participants in these non-privileged discussions, and testified about the general content of the emails. Additionally, as explained above, MLGW, in fact, produced the emails that were the subject of this line of questioning, and Houston does not refute MLGW's claim that it produced the emails in her reply. Further, as Houston concedes in her reply, Hartwell was not required to bring any documents to her deposition. (ECF No. 134 at PageID 2203.) Thus, the evidence does not show that Hartwell was unprepared to answer questions on topic number three.

- 16 -

Regarding topic numbers fourteen and fifteen, Houston argues that Hartwell's testimony was deficient because she was unable to provide the names of individuals who were involved in enacting MLGW's testing policy and any discussions that they had regarding the testing policy. (ECF No. 118 at PageID 986.) However, in her deposition testimony, Hartwell explained that she reviewed the documents and spoke with Angela Stewart, the manager of HPPD, regarding this document in preparation for the deposition. The document was created in December 2004, and there were no individuals named in the document. (ECF No. 122-5 at PageID 544 ("Testing Policy Statements").) Based on this evidence, Houston has failed to show that Hartwell was unprepared simply because she could not identify the names of the individual decisionmakers involved in preparing a policy in December 2004.

Finally, regarding topic number eighteen, Houston argues that Hartwell's testimony was deficient because she was unable to provide sufficient details related to another employee named Patrick Epps who was required to take a test to return to his previous role at MLGW. Specifically, Houston argues that Hartwell was unable to provide the year that Epps returned to his role, the name of the test that Epps was required to take, the name and position that Epps returned to after taking the test, the year Epps's appointment ended, and Epps's seniority at the time of his retirement. (ECF No. 118 at PageID 988.) However, Hartwell

testified that Epps took the required test to return to his previous role, that he had retired and did not take a test a second time, and that the information that she could not recall with specificity was included in the documents that MLGW had produced to Houston. This exchange does not show that Hartwell was insufficiently prepared to serve as a Rule 30(b)(6) deponent. For the reasons above, Houston's motion for sanctions and attorney's fees is DENIED.

Separately, MLGW argues that the court should award MLGW its attorney's fees incurred in responding to this motion under Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure. (ECF No. 122 at PageID 1041.) Although the motion for sanctions lacks a sufficient basis, the undersigned finds that, under the circumstances, attorney's fees are not warranted against Houston.

IT IS SO ORDERED.

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

June 7, 2024
Date